# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PROJECT BOAT HOLDINGS, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **C.A. No. 12606-VCS** |
| | : | |
| BASS PRO GROUP, LLC, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Date Submitted: February 1, 2019
Date Decided: May 29, 2019

John A. Sensing, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware and Mark S. Baldwin, Esquire, Dylan P. Kletter, Esquire and Anthony J. Boccamazzo, Esquire of Brown Rudnick LLP, Hartford, Connecticut, Attorneys for Plaintiff Project Boat Holdings, LLC.

S. Mark Hurd, Esquire and Richard Li, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware and Mike Stenglein, Esquire and Tracey M. Robertson, Esquire of King & Spalding LLP, Houston, Texas, Attorneys for Defendant Bass Pro Group, LLC.

**SLIGHTS, Vice Chancellor**

On February 10, 2015, Project Boat Holdings LLC ("Project Boat"), a manufacturer of recreational boats, sold three brands of its bass fishing boats to Bass Pro Group LLC ("Bass Pro"), a national outdoor recreational equipment retailer, for $260,000,000. After the sale, Bass Pro discovered that several purchasers of a particular line of boats included in the sale, the 2014 Triton 21 TrX (the "TrX"), had presented warranty claims to Project Boat after noticing that the hulls of the boats had cracked or delaminated.[1] Project Boat did not disclose the warranty claims or increase its warranty reserve in the financial statements provided to Bass Pro in connection with the Membership Interest Purchase Agreement (the "Agreement") that governs the transaction.

Bass Pro determined the cracks and delamination in the hulls resulted from Project Boat having manufactured the TrX hull with fewer layers of laminate than was called for in the boat's design. Bass Pro also concluded that this production flaw affected an entire production run of 2014 TrX boats and, therefore, case-by-case repairs would be inadequate to solve the problem. Instead, following the adage, "should you find yourself in a chronically leaking boat, energy devoted to changing

---

[1] As discussed below, "delamination" is a process by which the fiberglass laminate comprising the boat's hull decompensates. Delamination can occur in varying degrees.

1

vessels is likely to be more productive than energy devoted to patching leaks,"[2] Bass Pro elected to replace the hulls of every 2014 TrX produced with the allegedly defective hull. This decision prompted Bass Pro to initiate a "Replacement Program" whereby it recalled and replaced the hulls of every affected boat at an estimated total cost of $5 million.

A month before commencing its Replacement Program, Bass Pro notified Project Boat of a claim for indemnification under the Agreement, asserting that Project Boat's failure to disclose the manufacturing defect and account for it in its financial statements breached certain of the Agreement's representations and warranties. Bass Pro stated that its expected damages caused by the breach, not coincidentally, were $5 million. In response, Project Boat notified Bass Pro that its indemnification claim was factually deficient and failed to comply with the Agreement's notice requirements. Accordingly, it demanded that Bass Pro execute joint instructions for the release of the $2.6 million set aside in escrow under the Agreement to address post-closing indemnification claims.

When Bass Pro denied Project Boat's demand, Project Boat filed this action seeking a declaration that Bass Pro was in breach of the Agreement and an order compelling Bass Pro to release the escrow funds. Bass Pro counterclaimed for

---

[2] WARREN BUFFETT, THE ESSAYS OF WARREN BUFFETT: LESSONS FOR CORPORATE AMERICA (1st ed. 1998).

breaches of representations and warranties, including those that represented Project Boat had supplied accurate financial statements prepared in accordance with generally accepted accounting principles ("GAAP"), had set aside an adequate warranty reserve, had disclosed all warranty claims outside the ordinary course of business and had not encountered a change or event that had a Material Adverse Effect on the business. Bass Pro also alleged fraudulent inducement and related tort claims.

In this post-trial memorandum opinion, I conclude that the cracks and delamination in the TrX hulls were unusual and the warranty claims for the damaged hulls were outside the ordinary course of business. Nevertheless, Project Boat did not breach the Agreement by failing to disclose the warranty claims relating to the damaged hulls because Bass Pro did not prove that total replacement, rather than case-by-case repairs, of the hulls was the only means by which to address the warranty claims. Nor did Bass Pro prove that Project Boat's warranty reserve was insufficient to address the warranty claims, assuming those claims were addressed by case-by-case repairs or replacement as appropriate. I am also satisfied there was no Material Adverse Effect that would trigger disclosure obligations under the Agreement. Finally, whether measured by a preponderance of evidence or a clear and convincing evidence standard of proof, Bass Pro did not prove that Project Boat fraudulently induced Bass Pro to enter into the Agreement.

Judgment will be entered in favor of Project Boat and against Bass Pro. The parties shall issue joint instructions to the escrow agent to release the escrow funds to Project Boat. There will be no award of attorneys' fees.

## I. BACKGROUND

The Court held a four-day trial during which it heard live testimony from eight witnesses and received over 400 trial exhibits along with the lodged deposition testimony of each trial witness and two additional fact witnesses. I have drawn the facts from the stipulations of fact entered in advance of trial, the testimony and exhibits presented during trial and from reasonable inferences that flow from that evidence.[3] The following facts were proven by a preponderance of the evidence.

### A. The Parties and Relevant Non-Parties

Plaintiff/Counterclaim Defendant, Project Boat, is a Delaware limited liability company with its principal place of business in Beverly Hills, California.[4] At the time of the transaction at issue, Project Boat was a portfolio company of Platinum Equity, LLC and Platinum Equity Advisors, LLC (together "Platinum Equity").[5]

---

[3] Citations will appear as follows: "PTO ¶ __" shall refer to stipulated facts in the pre-trial order; "Tr. __ ([Name])" shall refer to witness testimony from the trial transcript; "JX__" shall refer to trial exhibits using the JX-based page numbers generated for trial; "JX__ ([Name] Dep.) __" shall refer to witness testimony from a deposition transcript lodged with the Court for trial.

[4] PTO ¶ 9.

[5] JX 192 §§ 4.27, 12.2(b); JX 312 (Wolf Dep.) 12–13, 180.

Project Boat, in turn, owned PBH Marine Holdings, LLC ("PBH Marine" or the "Company").[6] Through its 100% ownership of PBH Marine Group, LLC, which in turn owns 100% of Fishing Holdings, LLC ("Fishing Holdings"), PBH Marine owned fishing boat manufacturers Ranger Boats, Triton Boats and Stratos Boats.[7] The following chart depicts the assets Project Boat sold to Bass Pro along with the key personnel associated with each asset[8]:

Remainder of page intentionally left blank

---

[6] PTO ¶ 11.

[7] *Id.*

[8] In the briefs and during trial, the parties at various times referred to the entities within the Project Boat family interchangeably. Because my understanding is that Fishing Holdings sat directly above the three boat lines—Ranger, Triton and Stratos—I will refer to Fishing Holdings when describing the operational issues that led to the warranty claims at issue here.



Defendant/Counterclaim Plaintiff, Bass Pro, is a Delaware limited liability company with its principal place of business in Springfield, Missouri.[10] It operates

---

a national network of sporting goods retail stores and owns approximately 100 boat dealerships nationwide.[11]

## B. The Membership Interest Purchase Agreement

On November 14, 2014, Project Boat and Bass Pro executed the Agreement under which Project Boat sold to Bass Pro all issued and outstanding interests of PBH Marine for $260,000,000.[12]  The Agreement contains representations and warranties from the seller[13] and buyer.[14]  Bass Pro alleges Project Boat breached four representations and warranties set forth in Sections 4.8, 4.9, 4.23 and 4.26.

Under Section 4.8, Project Boat warranted that the Company's unaudited financial statements for the period between January 1, 2014 and July 27, 2014, presented fairly the Company's financial condition in accordance with GAAP.  More specifically, the provision states:

> Financial Statements. Attached as Schedule 4.8 are (a) the audited combined balance sheets and statements of income, cash flow and members' equity of Fishing Holdings, its Subsidiaries and 96 Ranger Road, LLC as of and for the twelve-month periods ended December 31, 2013 and December 31, 2012 (the "Audited Financial Statements") and (b) an unaudited combined balance sheet and statements of income and cash flow of Fishing Holdings, its Subsidiaries and 96 Ranger Road,

---

[11] JX 309 (Maliszewski Dep.) 16–17.

[12] PTO ¶ 11; JX 192 at 6, § 2.2.

[13] JX 192 Article IV.

[14] *Id*. Article V.

LLC as of July 27, 2014, and for period commenced January 1, 2014 and ended July 27, 2014 (the "Interim Financial Statements" and, together with Audited Financial Statements, the "Financial Statements"). Except as set forth on Schedule 4.8, the Financial Statements present fairly, in all material respects, the consolidated financial position and results of operations of the Company and its Subsidiaries as of the dates and for the periods indicated in such Financial Statements in conformity with GAAP consistently applied (except in the case of the Interim Financial Statements for the absence of footnotes and other presentation items and for normal year-end adjustments).[15]

Under Section 4.9, Project Boat represented that, as of November 14, 2015, the date of the Agreement's execution, and February 10, 2015, the date of the closing, there were no undisclosed liabilities of a type required to be reflected or reserved for under GAAP[16]:

Undisclosed Liabilities. Except as set forth on Schedule 4.9, there is no liability, debt or obligation of or claim against the Company or any of its Subsidiaries of a type required to be reflected or reserved for on a balance sheet prepared in accordance with GAAP, except for liabilities or obligations (a) reflected or reserved for on the Financial Statements or disclosed in the notes thereto, (b) that have arisen since the date of the most recent balance sheet included in the Financial Statements in the ordinary course of the operation of the business of the Company and its Subsidiaries consistent with past practice, (c) incurred in connection with the transactions contemplated by this Agreement, or (d) which do not exceed $250,000 in the aggregate.[17]

---

[15] *Id*. § 4.8.

[16] Tr. 186 (Hopper); JX 192 at 1. As part of the closing, Project Boat certified that its representations remained materially accurate. *Id.* § 9.2(a), (d).

[17] *Id.* § 4.9.

Section 4.23 of the Agreement warrants that there has been no change or event that would result in a Material Adverse Effect on Project Boat. The Agreement defines Material Adverse Effect, with a number of exceptions that do not apply here, to mean "a material adverse effect on the business, results of operations, financial condition or assets of the Company and its Subsidiaries, taken as a whole."[18] Section 4.23 states:

Absence of Changes.

a. Except as set forth on Schedule 4.23, from the date of the most recent balance sheet included in the Interim Financial Statements to the date of this Agreement, there has not been any change, event, development or occurrence that, individually or in the aggregate, has had or would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Company.

b. Except as set forth on Schedule 4.23, and except in connection with the transactions contemplated by this Agreement, from the date of the most recent balance sheet included in the Interim Financial Statements to the date of this Agreement, the Company and its Subsidiaries have, in all material respects, conducted their business and operated their properties in the ordinary course of business consistent with past practice.[19]

Finally, in Section 4.26, Project Boat warranted:

Product and Service Warranties. There is no pending or, to the knowledge of Seller, threatened (in writing) claim alleging any breach of any warranty or guaranty as to goods sold by the Company or its

---

[18] *Id*. at 12.

[19] *Id.* § 4.23.

Subsidiaries, other than as reserved for on the Reference Balance Sheet or for claims made in the ordinary course of business consistent with past practice, individually, which do not exceed $100,000.[20]

In the event of a breach of the representations and warranties, or a covenant or agreement contained within the Agreement, the affected party may seek indemnification by providing proper notice to the indemnitor[21]:

> If any Indemnified Party becomes aware of any circumstances that may give rise to an Indemnification Claim for any matter not involving an Action, then such Indemnified Party shall promptly (i) notify the Indemnitor and (ii) deliver to the Indemnitor a written notice (A) describing in reasonable detail the nature of the circumstances giving rise to the Indemnification Claim, (B) including the Indemnified Party's good faith estimate (based on the facts then known) of the amount of Damages that may arise from such circumstances, and (C) describing in reasonable detail the basis for the Indemnified Party's request for indemnification under this Agreement. Failure to notify the Indemnitor in accordance with this Section 11.3(c) will not relieve the Indemnitor of any liability that it may have to the Indemnified Party, except to the extent (1) the defense of such Indemnification Claim is actually materially prejudiced by the Indemnified Party's failure to give such notice or (2) the Indemnified Party fails to notify the Indemnitor of such Indemnification Claim in accordance with this Section 11.3(c) prior to the Survival Expiration Date; provided that an immaterial deficiency in a timely notice required by this Section 11.3(c) will not

---

[20] *Id.* § 4.26.

[21] *Id.* Article XI, §§ 11.2(a), (b).

relieve the Indemnitor of any liability that it may have to the Indemnified Party.[22]

At Section 11.2(a), Project Boat agreed that it would indemnify Bass Pro "for any and all damages to the extent arising from [] any breach of any representation and warranty in Article IV."[23] Section 11.4(a) sets an "indemnification cap" and Section 11.4(b) creates an indemnification "claims basket."[24] For Bass Pro, the indemnification cap for claims of breach of the representations and warranties at issue here (non-"Fundamental Representations") was the amount in the "Indemnification Escrow Fund."[25] The "claims basket" limits recovery for indemnification to circumstances where each individual claim exceeds $75,000, excluding costs and expenses, and the aggregate damages from all claims exceeds $350,000.[26]

Along with the Agreement, the parties executed an escrow agreement under which Bass Pro deposited $2,600,000 as the "Indemnification Escrow Amount" (the

---

[22] *Id.* § 11.3(c). *See also id.* § 11.1 (explaining that any claim for indemnification must be asserted "on or before the Survival Expiration Date [February 10, 2016] . . . by proper written notice in accordance with this <u>Article XI</u>, specifying, in reasonable detail, the basis of the claim . . . .").

[23] *Id.* § 11.2(a).

[24] *Id.* §§ 11.4(a), (b).

[25] *Id.* at 10, § 11.4(a)(i), (ii).

[26] *Id.* § 11.4(b).

"Escrow Agreement").[27]   In Section 4(g) of the Escrow Agreement, the parties agreed to execute joint instructions to the designated escrow agent, Wells Fargo, N.A., for the release of the escrowed funds "at such times as releases are required by [the Escrow Agreement] and the [Agreement]."[28]   In Section 11.8(b) of the Agreement, the parties agreed that if Bass Pro properly asserted a claim for indemnification before February 10, 2016, and the claim remained pending as of that date, the aggregate amount of the pending claim would be withheld from the Indemnification Escrow Amount and released upon satisfaction or resolution of the claim.[29]

## C. The 2014 Triton 21 TrX

PBH Marine acquired Ranger, Triton and Stratos in 2010 at a time when each was a struggling manufacturer of recreational fishing boats.[30]   After the acquisition, PBH Marine consolidated manufacturing for the three brands at Ranger's headquarters in Flippin, Arkansas to take advantage of Ranger's larger facility and to streamline operations.[31]   In the years following the consolidation, boat sales

---

[27] JX 225.

[28] *Id*. at 4, 26.

[29] JX 192 § 11.8(b).

[30] Tr. 152–55, 160-62 (Wolf); JX 315 (Bentz Dep.) 18.

[31] Tr. 158–59 (Wolf); JX 409 (Zittrower Dep.) 10–11; JX 315 (Bentz Dep.) 18.

12

improved. In 2014, when Bass Pro acquired PBH Marine, its three boat brands manufactured 71 boat models.[32] Ranger was regarded as the "premier" brand, manufacturing 37 models constituting 79 percent of PBH Marine's sales in 2014.[33] Triton was considered the middle-tier brand and produced 24 models comprising 17 percent of sales in 2014.[34] Stratos was a more discreet brand with ten models comprising four percent of annual sales in 2014.[35]

This litigation concerns just one of the 71 boat models Bass Pro acquired in the sale. The TrX is a 21-foot fiberglass bass fishing boat introduced in May 2013 to take the place of Triton's aging flagship model, the 21 HP.[36] With a more modern design, wider deck and 250-horsepower outboard engine,[37] the TrX was not unlike Ranger's best-selling Z521, a boat that was also approximately 21-feet in length with a wide beam and designed to carry high horsepower engines.[38] But the hulls of the

---

[32] PTO ¶ 12.

[33] *Id.*; JX 115 at 10; JX 313 (Adkisson Dep.) 27–28.

[34] *Id.*

[35] *Id.*

[36] Tr. 17–18, 99, 105 (Hopper), 441 (Zittrower); JX 313 (Adkisson Dep.) 26; JX 409 (Zittrower Dep.) 22–23, 33–34.

[37] Tr. 236 (Adkisson), 540 (Maliszewski); JX 313 (Adkisson Dep.) 26; JX 409 (Zittrower Dep.) 22–23.

[38] Tr. 18–20 (Hopper), 360–61 (Adkisson); JX 339 at 13; JX 405 (Hopper Dep.) 163–64.

2014 Triton and Ranger boats had important differences. The fiberglass structure for the hulls of Triton boats, by design, included at least three layers of chopped strand mat and two to three layers of woven roving (the "Triton Layup").[39] Ranger boat hulls, on the other hand, were designed to have three layers of chopped strand mat but only a single layer of woven roving (the "Ranger Layup").[40]

With all manufacturing occurring at the Ranger facility, it is not surprising that PBH Marine sought to achieve certain economies of scale. Given the similarities in the boats, the Product Improvement Team floated the possibility of using the Ranger Layup on Triton models.[41] In May 2012, a team of Ranger employees requested an order from Triton's Vice President of Engineering, Gary Zittrower, to create a prototype Triton 21 HP constructed with the Ranger Layup (the "Test Boat").[42] Consistent with its typical testing practices, Fishing Holdings

---

[39] Tr. 369 (Adkisson), 638–39, 642–45, 664–67, 677–78, 851–52 (Taylor); JX 322 at 5–6, 12–13; JX 339 at 15–17; JX 373; JX 376; JX 409 (Zittrower Dep.) 45–47. In a fiberglass boat, the laminate is the outer structural shell of the hull. Tr. 239–40 (Adkisson), 443–45 (Zittrower). The lamination schedule determines the type and quantity of materials to be used in the laminate. Tr. 22 (Hopper), 443–45 (Zittrower); JX 373. Typically, the outer layer of the laminate is a gelcoat that is laid onto a boat mold, followed by layers of fiberglass, resin, chopped strand mat and woven roving. Tr. 239–40 (Adkisson); JX 372.

[40] Tr. 643, 667–68 (Taylor); JX 322 at 6; JX 372.

[41] JX 314 (Houk Dep.) 75–76, 101; JX 405 (Hopper Dep.) 163–64.

[42] Tr. 23–24, 99–102 (Hopper), 497 (Zittrower); JX 1; JX 399; JX 409 (Zittrower Dep.) 23–25. Zittrower testified he was not aware that the Test Boat was made with the Ranger Layup, but had he known, he "wouldn't have stopped them from building the boat to test

took the Test Boat to a nearby lake where it was operated for 20 to 30 hours, including one day in rough seas, and then loaned the boat to two professional anglers for a few weeks of additional testing.[43] After testing, the Test Boat was returned to the plant for inspection of the hull, which exhibited no signs of cracking or other structural issues.[44] Satisfied with the Test Boat's performance, in June 2013, Fishing Holdings decided to manufacture the 2014 line of TrX boats with the Ranger Layup instead of the Triton Layup that had been deployed in prior Triton models.[45] The first sign of trouble with the TrX surfaced less than a year later.

## D. Early Problems with the TrX Hulls

On April 17, 2014, Triton warranty manager, Marty Morris, received an email from a TrX owner reporting cracks on the side of his TrX hull below the rod box

---

it to see what happens, because that's how you learn things in this business." Tr. 498 (Zittrower).

[43] Tr. 23–24 (Hopper), 703 (Taylor); JX 252 at 2; JX 315 (Bentz Dep.) 11, 13–14, 17–18 (testifying that testing of a fiberglass bass boat is typically performed in the water, not in a laboratory), 93 (testifying that boats were tested through 100 hours of "use and abuse," not stress testing); JX 409 (Zittrower Dep.) 31. I note that Bass Pro's expert, Robert Taylor, determined that the testing approach used by Fishing Holdings was inadequate. He reached that opinion, however, long after the time for expert discovery had closed. On Project Boat's motion, I struck that portion of Taylor's opinion as untimely. *See* D.I. 197 (letter opinion granting Project Boat's motion to strike). After reviewing the matter anew, I stand by that decision.

[44] Tr. 25 (Hopper).

[45] Tr. 20–21 (Hopper); JX 313 (Adkisson Dep.) 26–27, 125; JX 353; JX 405 (Hopper Dep.) 98, 146, 163–64, 225–26, 228, 238–43; JX 409 (Zittrower Dep.) 12, 17–18.

(the "Anderson Boat").[46]  Later that day, Morris forwarded the email to Zittrower, who sent the report to an engineering team and asked them to check whether "there was anything unusual about [the] construction" of the boat.[47]

Less than a month later, on May 7, 2014, Morris received a second complaint about a TrX with significant cracking on one side of the boat (the "Govreau Boat").[48] This time, Morris forwarded the report to Zittrower and others, including Tim Houk, who was in charge of managing warranty claims for all three boat brands.[49]  Morris suggested that the team bring the boat to Flippin for inspection and repair to make sure there were no issues with the lamination.[50]  By mid-June, however, the Govreau Boat remained with its owner, and on June 16, 2014, the owner informed his boat dealer that the cracks on his boat had grown larger and new cracks had emerged on

---

[46] JX 19.  The rod box is a hatch below the deck used to store fishing rods.  Tr. 25 (Hopper). The reported cracks in the Anderson Boat and in the boats discussed below are distinct from cracks in the gelcoat layer (i.e., the painted surface) of the boat, which are typically viewed as a minor cosmetic problem.  Cracks that extend past the gelcoat layer to the lamination can lead to delamination, which occurs when water pressure acts to separate the fiberglass and the layers beneath it.  If left unrepaired, the hull can peel apart entirely.  *See* Tr. 457, 462, 467–68 (Zittrower); JX 351 (Taylor Dep.) 51, 53.

[47] JX 21.

[48] JX 43.

[49] JX 44; JX 314 (Houk Dep.) 9–10.  Houk is now Bass Pro's Director for Customer Service and Warranty for Ranger, Triton and Stratos.  *Id.*  His testimony was presented by deposition; he did not appear at trial.

[50] JX 44; JX 66.

the other side of the boat.[51]  When Morris brought the issue to Houk's attention and showed him photos of the Govreau Boat in its damaged state, Houk noted, "quite a bit of white glass" and asked, "what did he [the owner] hit?"[52]  Morris responded, "[i]t would appear that way [that the boat had hit something] with the exception of getting these photos a month ago prior to the delam."[53]

A third TrX owner, who was also a boat dealer, reported damage to his hull two days later, on June 18, 2014 (the "Boat Doc Boat").[54]  The owner emailed several photos of his TrX directly to several members of the Fishing Holdings team and described multiple cracks as well as a "huge void" in the boat's hull.[55]  Morris forwarded the email to Houk and stated, "[s]ure looks like impact to me."[56]  Houk forwarded the report to the President and CEO of Fishing Holdings, Randy Hopper, and commented, "[h]ere's another."[57]  Later that day, Houk opined in an email to

---

[51] JX 66.

[52] JX 70.  It is apparently easy to determine when fiberglass has been damaged by impact because it delaminates at the area of impact and turns white where it is usually clear. Tr. 42–43 (Hopper).

[53] JX 70.

[54] JX 81.

[55] *Id.*

[56] *Id.*

[57] Tr. 14 (Hopper); JX 81.

Morris and Zittrower that the damage was impact-related but asked if the cracks were in the same place as the previous boats.[58]  Morris confirmed that the cracks on the Govreau Boat and the Anderson Boat were in the same area and suggested "we may have an issue here."[59]  Houk was not swayed, however, and expressed to Morris, Zittrower and later to Hopper that, in his judgement, the damage was caused by impact.[60]

**E. Triton Discovers That the TrX Is Manufactured With the Ranger Layup**

In May or June of 2014, Zittrower toured the Flippin manufacturing plant with Ron Marler, a process engineer for Ranger and Triton, and Vernon Goodman, Fishing Holding's lamination manager who was also a member of the team in charge of introducing the Ranger Layup to the TrX.[61]  The trio discussed the recurrent issues with TrX hulls and viewed the damage on the Anderson Boat.[62]  Despite having verified Goodman's request to produce the Test Boat with a different lamination

---

[58] JX 82.

[59] *Id*.

[60] JX 83; JX 84.

[61] Tr. 471–75, 517 (Zittrower); JX 1; JX 409 (Zittrower Dep.) 31, 35.  The exact date of Zittrower's visit to the Flippin plant, and whether it was before or after the Boat Doc Boat's report, are not clear, Tr. 474–75 (Zittrower) ("That would have been in the late May, June, sometime in that—I'm not real familiar with the date . . . ."), but Zittrower made trips to Flippin roughly twice per month during the summer of 2014.  JX 409 (Zittrower Dep.) 16–17.

[62] Tr. 472–73 (Zittrower).

18

schedule, Zittrower was surprised when Goodman informed him that the TrX had "a more Ranger-like" laminate.[63] Zittrower then informed Goodman, and later Hopper, that the laminate was too thin and that a change back to the original Triton Layup was required.[64] On June 25, 2014, Fishing Holdings began manufacturing TrX boats with the Triton Layup.[65]

## F. Project Boat Begins Discussions of a Sale to Bass Pro as More Complaints of Hull Damage Surface

By June 2014, Hopper and Project Boat executives were preparing sales materials for Bass Pro on the Ranger, Triton and Stratos boat lines.[66] Bass Pro's due diligence continued through November of that year. Kevin Maliszewski, Bass Pro's Vice President of Finance, represented Bass Pro in the negotiations with the assistance of Moelis & Co. and PricewaterhouseCoopers LLP.[67] The team that supported Project Boat's diligence efforts included Hopper, CFO of Fishing Holdings, Mendel Hughes, Vice President of Sales for Fishing Holdings, Keith Daffron, Platinum Equity Principal, David Wolf and three other Company

---

[63] Tr. 472–73, 480 (Zittrower). Zittrower testified that Dan Goodwin, also a member of the team in charge of introducing the Ranger Layup to the Triton boats, expressed his belief that Zittrower knew about the lamination schedule change. Tr. 473 (Zittrower); JX 1.

[64] Tr. 116–17 (Hopper), 368–69 (Adkisson), 473–75 (Zittrower).

[65] Tr. 115–17 (Hopper), 364–65, 368–69 (Adkisson), 482 (Zittrower).

[66] PTO ¶ 15; Tr. 168–70 (Wolf); JX 115.

[67] JX 309 (Maliszewski Dep.) 26–28, 49–51.

19

representatives.[68]  Hopper, Hughes and Daffron were responsible for satisfying Bass Pro's due diligence requests and ensuring Project Boat's compliance with its representations and warranties.[69]  They were also designated as three of the four Project Boat "Persons with knowledge" for purposes of certain covenants in the Agreement, along with another Ranger executive, Bart Schad.[70]  Ernst & Young audited the Company's financial statements, including Fishing Holding's methodology for assessing the sufficiency of the warranty reserve.[71]

While Project Boat and Bass Pro negotiated the transaction, reports concerning problems with the TrX hulls continued to surface.  On August 1, 2014, Zittrower and then-Vice President of Sales and Marketing for Triton, Adam Adkisson, received a report of delamination that the owner thought might be due to the boat having hit a piece of rebar that cut through its gelcoat and fiberglass layers (the "Card Boat").[72]  Three days later, another TrX owner reported cracking and delamination on both sides of his hull in the same place as the Boat Doc Boat and

---

[68] JX 312 (Wolf Dep.) 17–18, 65–69.

[69] *Id*. 69, 73–76, 81, 93–94, 144–45, 155–56, 217–18.

[70] JX 192 § 1.3; JX 313 (Adkisson Dep.) 141.

[71] Tr. 552–53 (Maliszewski); JX 193 at 18, 31.

[72] Tr. 216 (Adkisson); JX 117.  After Bass Pro purchased PBH Marine, Adkisson continued his role at Triton.  Tr. 215 (Adkisson).  He left the company only recently when Bass Pro decided to relocate Triton's headquarters to Springfield, Missouri.  *Id*.

20

the Govreau Boat (the "Sensabaugh Boat").[73]  The dealer expressed concern that "there may have been something out of the ordinary there."[74]  In early September 2014, three more TrX owners reported damage to their hulls.[75]

With the exception of the Card Boat, which was covered by insurance,[76] Fishing Holdings addressed each reported instance of TrX hull damage under the TrX warranty.[77]  As with all Triton fiberglass boats, Fishing Holdings/Triton represented to TrX purchasers that Triton would "repair or replace, at its sole discretion, defects in materials or workmanship that occur and are reported to Triton,

---

[73] Tr. 292, 377–81 (Adkisson), 495 (Zittrower); JX 118–20.

[74] JX 119.

[75] Tr. 302–303, 305–308 (Adkisson); JX 366.  Bass Pro prepared JX 366 as a compilation of other spreadsheets and databases concerning the TrX hull issues.  Tr. 421–22 (Adkisson). The supporting sources include JX 368 and JX 375 (printouts of the warranty claims database for Triton boats); JX 410 (a compilation of PDFs of warranty claims made for the TrX); JX 243 (a list Houk compiled of TrX hull repairs and replacements). *See also* Tr. 259–62 (Adkisson) (explaining the warranty claims database).  Although JX 243 was not introduced as an exhibit in Houk's deposition, it is fair to assume from his descriptions of his list that it is the same compilation.  JX 314 (Houk Dep.) 73–75, 80, 83–84.  I note Project Boat's limited objection to the "First Fail Notice" column in JX 366; the objection is moot, however, as these three September boat failures are also listed in Houk's compilation with similar dates.

[76] JX 144 (Morris wrote to Houk, "Card's boat has hull damage resulting from impact damage which caused port side delamination.  The insurance company has requested an estimate for hull replacement cost transferring accessories over to the new hull.").  Adkisson testified that Triton later determined that the boat's damage was due to the lamination schedule, though there is no credible evidence as to how or why that determination was made.  Tr. 395–96, 398 (Adkisson).

[77] JX 366. In 2014, Fishing Holdings repaired five of the affected boats and replaced the hulls of three.  *Id.*; JX 243.  The hull of the Boat Doc Boat was replaced in 2015.  *Id.*

21

or its factory authorized fiberglass dealer, within the applicable warranty periods."[78] The warranty specifically covers a "Structural Hull Defect," meaning, for fiberglass boats, "a substantial defect in the fiberglass boat's Hull, which causes the fiberglass boat to be unfit or unsafe for general use as a pleasure craft under normal operating conditions."[79]

According to Houk, who, as a warranty manager, was "charged with making happy customers out of mad customers for the least amount that I have to spend to do that," the normal course of dealing with damaged hulls was (and should be) to repair or replace the boats, as appropriate, when the customer reported a problem.[80] Indeed, Fishing Holdings had a number of employees devoted to repairs of fiberglass hulls since gelcoat and fiberglass damage comprised a large portion of its warranty claims.[81] Because the hulls were consistently showing damage in the area around the rod box, an accessible central location, Fishing Holdings viewed the repairs as

---

[78] JX 395; JX 396.

[79] *Id.*

[80] JX 314 (Houk Dep.) 27, 86–87.

[81] Tr. 33–34 (Hopper), 166–67 (Wolf).

easy to make and as a permanent solution.[82] Moreover, the repairs were not costly, reaching, at most, just over $5,000 per hull.[83]

At Triton, however, Adkisson and Triton's CEO and founder, Earl Bentz, believed the hull damage, when viewed alongside the decision to use the Ranger Layup, indicated a serious problem affecting an entire production run of 2014 TrX boats.[84] They reasoned that putting a patch inside of the hull would not be equivalent to putting an extra layer of lamination throughout the hull, and thus concluded the repairs were inadequate and likely to fail.[85] According to Bentz and Adkisson, the only way to handle the problem properly would be to recall and replace all affected TrX hulls.[86]

---

[82] Tr. 25, 60, 71–72, 86 (Hopper); JX 278 at 4; JX 314 (Houk Dep.) 86–87; JX 405 (Hopper Dep.) 165.

[83] JX 243; JX 410.

[84] Tr. 319–21, 325–26, 371, 431–32 (Adkisson); JX 315 (Bentz Dep.) 14, 16, 36–37, 87. When Triton was owned by Platinum Equity, Bentz reported to Hopper. JX 315 (Bentz Dep.) 22. Bentz continues to hold the title of CEO and founder of Triton at Bass Pro, where he works a few days a month. *Id*. His testimony was presented by deposition; he did not appear at trial.

[85] Tr. 321–22 (Adkisson); JX 313 (Adkisson Dep.) 189, 190; JX 315 (Bentz Dep.) 55, 86–87. For his part, Zittrower testified that he did not know at the time whether the repairs would work but was hopeful they would solve the problem. Tr. 492 (Zittrower).

[86] Bentz and Adkisson testified that, on a regularly scheduled conference call held shortly after Zittrower's visit to Flippin, Bentz expressed to Fishing Holdings management his view that a recall of the TrX was necessary. Tr. 317–21 (Adkisson); JX 315 (Bentz Dep.) 28–30. According to Bentz and Adkisson, Hopper disagreed and decided on this call to repair the affected boats on a case-by-case basis. *Id*. Neither Hopper nor Houk, who participated in the weekly calls, remember discussion of a recall or a decision to repair the

In late September 2014, Triton and Ranger separately sponsored several participants at the Bassmaster Elite Series Angler of the Year event in Escanaba, Michigan ("Escanaba").[87]  As the second largest bass fishing tournament of 2014, Escanaba hosted the top fifty professional bass fishermen for a nationally televised qualifier tournament for the Bassmaster Classic—the annual championship tournament for bass fishermen.[88]  The poor weather conditions at Escanaba were described as "unprecedented," with steady winds over 20 mph causing high seas that resulted in a small craft advisory from the National Weather Service.[89]  Several practice days were cancelled and the tournament was suspended for three days due to "unsafe boating conditions."[90]  When the anglers did make it onto the water, five of six TrX boats reportedly experienced damage to their hulls, and Triton sent two employees to Michigan to repair the boats so they could continue to fish the tournament.[91]

---

boats on a case-by-case basis. JX 314 (Houk Dep.) 37–38; JX 405 (Hopper Dep.) 115–21. While it would appear that Bentz and Adkisson expressed their views concerning the issue to Hopper, I make no findings of fact with respect to whether Hopper decided on this call to address the cracks and delamination on a case-by-case basis.

[87] Tr. 51–52 (Hopper), 303–304 (Adkisson).

[88] Tr. 49–50 (Hopper), 303–304 (Adkisson).

[89] Tr. 52–54 (Hopper), 765 (Taylor); JX 151; JX 351 (Taylor Dep.) 41–42.

[90] *Id.*; Tr. 310 (Adkisson).

[91] Tr. 55–56 (Hopper), 485–87 (Zittrower); JX 153.

The day after Escanaba concluded, on September 22, 2014, Zittrower consulted with Bentz[92] and emailed Hopper regarding the hull failures at the tournament.[93]  Zittrower explained,

> The hull failures were due to the laminate reduction that I brought to your attention earlier this summer.  The boat hulls that failed in Escanaba were manufactured last November.  There are several other 21 TRX hulls that have been repaired that were manufactured after November.  Since we do not know when the laminate reduction in the hull was made, it is foreseeable the entire 2014 model year of 21 TRX's is affected.  182-21 TRX models were manufactured in the 2014 model year.  The potential for a significant increase in warranty cost for 2015 is real for the 21 TRX models that did not get the proper laminate during the manufacturing process. . . .[94]

Hopper did not respond to the email.[95]  Instead, based on conversations with Houk and the team's previously demonstrated ability to repair hull cracks and delamination, he determined that Fishing Holdings should continue to repair the TrX hulls on a case-by-case basis.[96]

---

[92] JX 152.

[93] JX 153.

[94] *Id*.

[95] Tr. 59 (Hopper).

[96] Tr. 59–61 (Hopper).  Hopper claims he spoke with Houk in making this decision. *Id*.  Houk did not recall the conversation, but he estimated he spoke with Hopper about the TrX hull issues between five and ten times.  JX 314 (Houk Dep.) 66–67, 94.

25

Four additional damaged TrX hulls were reported to Triton after Escanaba in September and October 2014.[97] Project Boat repaired two of the boats in 2014 and replaced the hulls of the other two in 2015.[98] On or about October 21, 2014, the owner of the Sensabaugh Boat, whose hull had been repaired in August 2014, reported cracks on the opposite side of the boat.[99] By November 14, 2014, the day the Agreement was executed, one more TrX had shown damage to its hull and was repaired.[100]

## G. The Warranty Claims

Altogether, by the time of the Agreement, Project Boat had sold 172 TrX boats and had received reports of 17 hull cracks or delamination, all of which appeared around the same area of the hull.[101] Twelve of these hulls had been repaired and five

---

[97] Tr. 311 (Adkisson); JX 243; JX 366.

[98] Tr. 311–13 (Adkisson); JX 243; JX 366.

[99] Tr. 293–98 (Adkisson), 495 (Zittrower), 726 (Taylor); JX 249; JX 410 at 11–13.

[100] Tr. 313–14 (Adkisson); JX 243; JX 366. I do not include the Buckingham Boat, although it is referenced in JX 366 as having failed on November 1, 2014, because there is no credible evidence of a November failure date.

[101] Tr. 314–15 (Adkisson); JX 366. This number for hull damage excludes the Card Boat and the Buckingham Boat. It also excludes the Coble Boat. JX 366 indicates a report of "port bow hull cracks" at the end of April 2014 for the Coble Boat, but it has no repair listed until the hull was replaced in the Replacement Program. The supporting exhibits, however, indicate repairs for "port bow hull gel separated, port bow hull cracks," at a cost of $520 on April 29, 2014. JX 410 at 13; *see also* JX 368 at 1, JX 375 at 180 (repairs for "hull gelcoat flake" at the same cost). Additionally, the Coble Boat is not listed on JX 243. This evidence suggests the cracks were not of the type typically considered to reflect the

had been replaced, or were expected to be replaced, under warranty.[102] At the end of 2014, by Bass Pro's count, Fishing Holdings had incurred approximately $59,000 in third-party warranty costs for the TrX; $41,885 of those costs were related to the hull issue.[103] The warranty reserve at that time was approximately $8,017,000.[104]

Neither the interim financial statements for the period between January 1, 2014 and July 27, 2014, nor the disclosure schedules attached to the Agreement reported the TrX hull issue.[105] The transaction closed on February 10, 2015.

## H. Bass Pro Learns of the TrX Lamination Issue

In May 2015, Bentz met with Bass Pro President, Jim Hagale, and its founder, Johnny Morris, to discuss Triton's loss of market share to a particular competitor.[106] Bentz expressed to Hagale that Hopper's team was focused on Ranger and that management of the Triton brand should be turned over to Bentz.[107] As one example

---

lamination issue, or that the repair was not of the kind typically performed to address the issue.

[102] JX 243; JX 366.

[103] JX 310 at 13, Ex. H. JX 313 (Adkisson Dep.) 42–43. These amounts are consistent with the repair costs listed on JX 243.

[104] JX 210 at 15.

[105] JX 193.

[106] JX 315 (Bentz Dep.) 40.

[107] *Id*. 42–43.

of poor management, Bentz cited the lamination problems with the TrX and suggested that the approach of making case-by-case repairs to the boats was damaging the image of the Triton brand.[108]  According to Bentz, Hagale did not respond to, or even seem to register, the issue.[109]

In late September or early October 2015, Bentz and Adkisson met with Maliszewski to inform him of the hull issue.[110]  Bentz stated that at least Hopper and Daffron had known about the problem prior to the sale but had done nothing about it.[111]  Maliszewski reported this to Bass Pro's general counsel.[112]

---

[108] *Id*. 43.

[109] *Id*. 43–44.

[110] Tr. 326 (Adkisson); JX 309 (Maliszewski Dep) 113.  According to Bentz and Adkisson, Bentz told Maliszewski about the hull issue because Maliszewski was asking why the warranty costs were continuing to rise.  Tr. 327 (Adkisson); JX 313 (Adkisson Dep.) 132; JX 315 (Bentz Dep.) 46.  Maliszewski, however, did not recall that he noticed the warranty costs increasing; he recalled that he became aware of the TrX issues after Bentz told him that knowledge of the problem within the industry had spread after Escanaba.  JX 309 (Maliszewski Dep.) 113 (Q: Did he say why he was telling you now in September or October of 2015 about the hull issue?  A: . . . [Bentz] had raised it to the leadership in Fishing Holdings who had done nothing about it, but yet at key events they were having these failures and it was becoming predominantly known within the industry that there were issues with the boats.").

[111] JX 309 (Maliszewski Dep) 113–14.

[112] *Id*. 24, 114.

In October 2015, Bass Pro hired a products liability attorney and Robert Taylor, a marine forensics expert, to investigate the problems with the TrX.[113] Taylor visited the manufacturing facility at Flippin, inspected several boats, interviewed company management and employees and conducted a burn test of samples of the Ranger Layup and Triton Layup that confirmed the laminates were different.[114] He concluded his investigation in late November or early December 2015 and determined that a safety recall of the TrX was not necessary under U.S. Coast Guard regulations.[115]

After informing Bass Pro of this conclusion, Taylor was asked to determine what repairs were necessary to correct the affected boats.[116] In December 2015, consistent with Bentz and Adkisson's views, Taylor concluded that the TrX needed

---

[113] Tr. 329 (Adkisson); JX 351 (Taylor Dep.) 6.

[114] Tr. 621–27, 694 (Taylor); JX 322. A burn (or "burnout") test determines the constituents of a sample of laminate by melting the materials off at different temperatures. Tr. 637–38 (Taylor). Taylor did not conduct a load analysis to quantify the strength of the Ranger and Triton Layups until November 2017. Tr. 669–72 (Taylor); JX 320; JX 344; JX 351 (Taylor Dep.) 67.

[115] Tr. 574 (Maliszewski), 628 (Taylor); JX 351 (Taylor Dep.) 62. Taylor concluded that the TrX failures did not prevent boat operators from returning to shore safely, that there were no reported injuries or deaths caused by the hull issue, and that the TrX is designed to have "upright level flotation," a requirement of the Code of Federal Regulations mandating that the boat continue to float if it is filled with water. Tr. 627–29 (Taylor); JX 351 (Taylor Dep.) 42–43. For these reasons, the TrX defect "did not rise to the level of a safety recall to the Coast Guard." Tr. 628 (Taylor).

[116] JX 351 (Taylor Dep.) 63–66.

thicker lamination throughout the boat and any repair to the hull short of replacement would be expensive, complicated and ultimately insufficient.[117]

While Taylor conducted his investigation, Adkisson was tasked with estimating the cost of replacing all TrX boats produced with the Ranger Layup.[118] He concluded that the "Replacement Program" would cost $5 million based on the costs to manufacture replacement hulls, transport defective hulls to the Ranger factory, transport replacement hulls to dealers and transfer owners' equipment onto the replacement hulls, as well as the costs for legal and public relations assistance and miscellaneous smaller costs.[119]

On March 14, 2016, by letter from Bentz to all TrX owners, Bass Pro announced that it would replace the 209 boats determined to have been produced with the Ranger Layup.[120] At the Replacement Program's conclusion, Bass Pro had inspected and replaced 173 hulls (not including those that had been replaced prior to

---

[117] Tr. 691–93 (Taylor); JX 351 (Taylor Dep.) 63–64.

[118] Tr. 331–32 (Adkisson).

[119] Tr. 332–33 (Adkisson); JX 313 (Adkisson Dep.) 186 ("Q: [Y]ou're the guy who calculated per-boat cost of the replacement program, and you were projecting something just north of $23,000 on a per-boat basis, right? A: That's correct.").

[120] Tr. 332–33 (Adkisson); JX 275; *see also* Tr. 334 (Adkisson) (explaining the process of establishing the databases for the Replacement Program, which took place between November 2015 and March 2016); *id*. 252–55 (explaining how Bass Pro determined the 209 boats to be replaced).

the program).[121]  Bass Pro identified cracks in 28 of the hulls; the remainder showed no signs of damage.[122]  As of trial, the program's cost was $6,651,840.29, including attorneys' and expert fees incurred in connection with the litigation and $62,880 for a social media expert.[123]

## I. Bass Pro's Claim Notice and the Commencement of Litigation

About a month before Bass Pro notified TrX purchasers of the Replacement Program, it notified Project Boat of its indemnification claims in a February 10, 2016 letter (the "Claim Notice").[124]  The Claim Notice states that "certain [] 2014 Triton 21 TrX boats have developed cracks in their hull-side panels and, in some cases have suffered delamination and/or required hull repairs due to such cracking," and that "other 2014 Triton 21 TrX boats constructed with a Ranger hull lamination schedule are at risk for the same cracking and delamination issue."[125]  As a result of these issues, Bass Pro predicted that the damages would be at least $5 million, including the cost of "repairing or replacing the deck/hull assembly, if and as appropriate, in certain 2014 Triton 21 TrX boats constructed with the Ranger hull

---

[121] JX 366.

[122] *Id.*

[123] Tr. 337–52 (Adkisson); JX 308; JX 352.

[124] JX 257.

[125] *Id.*

lamination schedule" as well as "responding to any consumer claims based on the use of the Ranger hull lamination schedule in the construction of certain 2014 Triton 21 TrX boats."[126] The Claim Notice made no reference to a plan to recall and replace all affected hulls.[127]

Project Boat objected to the Claim Notice on March 3, 2016, arguing that Bass Pro had failed to provide the level of detail required under the Agreement and had failed to state a claim for relief.[128] Almost two weeks later, Bass Pro notified Project Boat that it had decided to replace all affected boats through the Replacement Program.[129]

---

[126] *Id.*

[127] It appears that Bass Pro, and Taylor, were under the impression that Fishing Holdings had mistakenly utilized the Ranger Layup as a consequence of confusion at the "cut shop." JX 351 (Taylor Dep.) 36l; JX 409 (Zittrower Dep.) 34–35 (explaining how he initially believed that use of the Ranger Layup in the TrX had been a mistake). It also appears that this was the factual predicate upon which the Claim Notice and Bass Pro's Counterclaim rested—that Project Boat had discovered the "mistake" but had hidden the mistake from Bass Pro. *See* Answer to Verified Compl., Affirmative Defenses and Countercls. ("Answer") (D.I. 19) 27 ¶ 6 (describing "hull mismatch"). It was not until the deposition of Hopper, taken on May 2, 2018, that it was made clear to all that Fishing Holdings had made a deliberate move to use a Ranger lamination schedule on the TrX hull. *See* JX 405 (Hopper Dep.) 96–104 (Hopper confirming that Fishing Holdings had decided to use the Ranger Layup on the TrX and explaining the reasons for that decision). I will confess that Bass Pro's change in narrative, and failure to own that change, has raised questions, in my mind, regarding the credibility of its current claims of breach and, especially, of its claim of fraud. *See* Answer 29 ¶ 11, 43 ¶ 51 (alleging fraudulent concealment of the "hull mismatch"). The about face was by no means dispositive, however.

[128] JX 267.

[129] JX 278.

## J. Procedural History

On July 29, 2016, Project Boat filed its Verified Complaint setting forth two counts. Count I seeks a declaratory judgment that Bass Pro is not entitled to indemnification with respect to Project Boat's alleged breaches of the Agreement asserted in Bass Pro's Claim Notice. Count II alleges that Bass Pro breached the Agreement by failing to release the escrowed funds to Project Boat and, on that basis, seeks an order compelling Bass Pro to release the escrow funds. Bass Pro answered the Complaint on October 5, 2016, asserting Affirmative Defenses and Verified Counterclaims for breach of warranty (Count I), indemnification (Count II), fraudulent concealment (Count III), fraudulent inducement (Count IV), breach of the covenant of good faith and fair dealing (Count V) and declaratory judgment and injunctive relief (Count VI).[130]

On July 26, 2017, the Court dismissed Counts III and V of Bass Pro's counterclaims and Count IV to the extent it alleged fraudulent inducement with respect to Section 4.8 of the Agreement regarding the accuracy of Project Boat's financial statements.[131] On May 1, 2018, the Court denied Project Boat's motion for

---

[130] Answer 25–51.

[131] D.I. 64. I dismissed Bass Pro's fraudulent inducement claim with respect to Section 4.8 upon finding that Bass Pro failed to allege facts allowing a reasonable inference that Project Boat's failure to account for the warranty claims would materially affect the accuracy of the financial statements or their compliance with GAAP. *See* Arg. on Pl.'s Partial Mot. to Dismiss Tr. (D.I. 228) 67–68.

33

partial summary judgment as to Counts I and II of Bass Pro's counterclaims.[132] Trial proceedings concluded on June 7, 2018, and the parties presented post-trial oral argument on February 1, 2019. On February 22, 2019, the parties submitted supplemental letters regarding their requests for attorneys' fees.[133] The matter was submitted for decision that day.

## II. ANALYSIS

Bass Pro alleges Project Boat breached representations and warranties in the Agreement, specifically those set forth in Section 4.8, 4.9, 4.23 and 4.26, and fraudulently induced Bass Pro to enter the Agreement by intentionally concealing the TrX manufacturing defects and failing to set aside an adequate warranty reserve to address the inevitable warranty claims to follow. Project Boat counters that Bass Pro breached Sections 8.2 and 11.8 of the Agreement, and Section 4(g) of the Escrow Agreement, by improperly withholding the escrowed funds. Each party bears the burden of proving its claims or counterclaims by a preponderance of the evidence.[134]

I first address Bass Pro's breach and indemnification claims. To prevail on a breach of contract claim, a party must prove: (1) the existence of a contract, (2) the

---

[132] D.I. 146.

[133] D.I. 225; D.I. 226.

[134] *See eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013).

breach of an obligation imposed by the contract; and (3) damages suffered because of the breach.[135]  Because the existence of a valid agreement is undisputed, I focus on the allegations of breach and resulting damages.  For reasons I explain below, I have determined that Project Boat did not breach the seller's representations and warranties in Section 4.8 and 4.9 by failing to set aside $5 million as an additional warranty reserve to cover the costs of replacing the TrX hulls.  Though Project Boat should have disclosed the TrX warranty claims under Section 4.26, as they were claims made outside of the ordinary course of business, Bass Pro has not proven that the warranty claims could not be addressed under the existing warranty reserve, and so has not proven damages as a result of the non-disclosure.  Bass Pro also has not proven that the warranty claims resulted in a Material Adverse Effect on PBH Marine as a whole, so I find no breach of Section 4.23.

I next address Bass Pro's claim for fraudulent inducement.  Bass Pro has not provided credible evidence that Project Boat intended to induce Bass Pro to enter the transaction by withholding disclosure of the TrX warranty claims.  Nor has Bass Pro proven that it would not have entered the transaction had it known about the warranty claims.  Its claim for fraudulent inducement, therefore, fails as well.

---

[135] *Id*. (citing *Barkerman v. Sidney Frank Importing Co.,* 2006 WL 3927242, at *19 (Del. Ch. Oct. 10, 2006)).

Next, I take up Project Boat's claim that Bass Pro breached the Agreement and Escrow Agreement. As initial matters, I find that Bass Pro's Claim Notice was sufficient under the Agreement, and Bass Pro did not breach the Agreement or the Escrow Agreement by withholding the escrowed funds pending the resolution of its breach of contract claims. But, having failed to prove any breaches of representations and warranties under the Agreement, Bass Pro must now give its consent to the Escrow Agent to release the escrowed funds to Project Boat.

Finally, I address the competing claims for counsel fees. Because neither party has breached the contract and neither is entitled to indemnification, I conclude that neither party is entitled to recover its attorneys' fees under the Agreement.

## A. Project Boat Did Not Breach the Agreement by Failing to Set Aside an Additional $5 Million Warranty Reserve

The parties agree that, under GAAP, Project Boat was required to report and reserve for a contingent liability (which includes a warranty liability) if the information available to Project Boat as of July 27, 2014, November 14, 2014, and February 10, 2015, indicated that (1) it was probable a liability had been incurred and (2) the liability was reasonably estimable.[136] The FASB ASC glossary defines

---

[136] JX 378 (Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") at 460-10-25-5) ("Because of the uncertainty surrounding claims that may be made under warranties, warranty obligations fall within the definition of a contingency . . . losses from warranty obligations shall be accrued when the conditions in paragraph 460-20-25-2 are met."); JX 379 at FASB ASC 460-20-25-2 ("An estimated loss from a loss contingency shall be accrued by a charge to income if both of the following

"probable" to mean that "the future event or events are likely to occur."[137] According to Bass Pro, if the liability was not estimable because the range of possible loss was too wide, then Project Boat should have postponed recording revenue from the TrX sales until after the warranty period or until it had more information regarding the likely magnitude of the liability.[138]

Bass Pro's breach claims under Sections 4.8 and 4.9 rest on the premise that Project Boat knew that each of the TrX boats produced with the Ranger Layup would probably have to undergo a total hull replacement.[139] With this knowledge in hand, Bass Pro posits that Project Boat's Financial Statements, as described in Section 4.8, did not "present fairly, in all material respects, the consolidated financial position and results of operations of the Company and its Subsidiaries . . . in conformity with GAAP . . . ."[140] Nor, according to Bass Pro, could Project Boat accurately represent

conditions are met: a. Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements . . . b. The amount of loss can be reasonably estimated."). *See also* Tr. 971 (Orr) (Bass Pro's accounting expert explaining ASC 450's "probability requirement").

[137] FASB ASC 540-20-20, https://asc.fasb.org/glossarysection&trid=2127172 (last visited May 2, 2019).

[138] *See* JX 378 at FASB ASC 460-10-25-6.

[139] *See* Post-Trial Arg. Tr. (D.I. 227) 69 (counsel for Bass Pro acknowledging that if a repair *or* replace approach to addressing the TrX hull issues was adequate, Bass Pro does no "prevail on [its] breach claim").

[140] JX 192 § 4.8.

that "there is no liability, debt or obligation of or claim against the Company . . . of a type required to be reflected or reserved for on a balance sheet prepared in accordance with GAAP . . . ."[141]

The problem with Bass Pro's theory is that the preponderance of the evidence does not support that Project Boat knew that all TrX hulls produced with the Ranger Layup probably would have to be replaced. For that matter, the preponderance of the evidence does not support the contention that case-by-case repairs were inadequate to address the cracking and delamination issues that plagued the TrX. Fishing Holdings historically did not issue broad product recalls unless the defect presented a fundamental safety issue.[142] There is no evidence that the cracking and delamination of TrX hulls presented any safety concerns. Indeed, before assuming his role as a litigation expert witness, Taylor investigated that very issue on behalf of Bass Pro and determined that a product recall was not required by Coast Guard

---

[141] *Id*. § 4.9.

[142] JX 2 (email from Mendel Hughes indicating that Project Boat's warranty reserve calculation was modified in 2012 to account for the recall of a digital start keypad); JX 11 (financial analysis of the recall); Tr. 45 (Hopper) (testifying that he had no knowledge of a recall, except for safety issues); Tr. 522–23 (Zittrower) (testifying that since his time at Triton beginning in 1997, he was not aware of a product recall); JX 405 (Hopper Dep.) 171–73; 255–56 (testifying to prior recalls of an electrical component and steering component by vendors that were performed in cooperation with the Coast Guard).

standards.[143]     Even Bentz stated that it was highly unlikely the TrX hull issues compromised boater safety given that the "boats have upright, level flotation, and a crack in the bottom of the hull may cause some delamination but it's highly unlikely that it would result in a [sic] accident . . . ."[144]

Rather than initiate full product recalls, Fishing Holding's practice was to repair damaged boats as needed on a case-by-case basis, typically under warranty.[145] The damaged TrXs were treated no differently.  This is not surprising given that the applicable TrX warranty covered cracks and delamination of the hulls and reserved to the boat manufacturer the right to repair or replace as it deemed appropriate.[146] According to Houk, a particularly credible witness, in my view, given his past position with Fishing Holdings and current position with Bass Pro, the practice of repairing or replacing on a case-by-case basis was a cost-efficient and effective

---

[143] Taylor does not mention the conclusion of his preliminary investigation into the safety of the hull issue in his report, but he explained his initial conclusions at trial. *See* Tr. 627–29 (Taylor).

[144] JX 315 (Bentz Dep.) 48–49.

[145] Tr. 31–32, 60–61 (Hopper).

[146] JX 395 (**"THE SOLE AND EXCLUSIVE REMEDY UNDER THIS LIMITED WARRANTY AND ANY APPLICABLE IMPLIED WARRANTY IS THE REPAIR OR REPLACEMENT, AT TRITON'S SOLE OPTION, OF WARRANTED PARTS AND COMPONENTS."**) (emphasis in original).

solution to dealing with all prior claims for damaged fiberglass hulls.[147]  In his opinion, even now, there was no reason to recall and replace all TrX hulls.[148]

The cost-effectiveness of repairing or replacing as necessary is supported by Houk's records, which show that the cost of repairs ranged from $2,250 to, at most, $5,383.[149]  Indeed, Project Boat had incurred just $41,885 in third-party warranty costs due to the TrX hull issues by the end of 2014, when its warranty reserve was over $8 million.[150]  Not one hull was replaced prior to the date of the Interim Financial Statements.[151]  Indeed, the Company had not incurred a single dollar in warranty costs related to the alleged hull issues by the date of the Interim Financial Statements.[152]

Bass Pro argues that, at the time of the Interim Financial Statements, the warranty reserve did not reflect the earliest TrX claims.  Project Boat agrees that

---

[147] JX 314 (Houk Dep.) 28, 81–82, 86–87.

[148] *Id*. 26–27, 86–87.

[149] JX 243.  The maximum exposure, assuming repairs of all 209 TrX hulls produced with the Ranger Layup, at the highest projected cost of repair, is $1,125,047 (209 x $5,383). Of course, there is no evidence that all 209 boats would have required repairs, nor is there evidence that all repairs would have cost more than $5,000.

[150] JX 210 at 15; JX 310 at 13, Ex. H; JX 313 (Adkisson Dep.) 42–43. Bass Pro argued that there were costs in addition to the amount identified but did not put forward any credible evidence to prove it.

[151] JX 243; JX 366.

[152] *Id*.

because the first three warranty claims had not yet been paid, the reserve as of July 27, 2014, did not yet account for the TrX issue.[153] But there is no indication that the reserve at that time (approximately $7 million) would have been insufficient to address the claims, which included one repair and two replacements.[154] According to Ernst & Young, the Company's "[p]rovisions for estimated future warranty claims are made at the time of the product sale, with actual payments for such claims being charged against the reserve for warranty when incurred."[155] Consistent with this practice, the Interim Financial Statement reserve reflected an increase to accommodate the sale of each TrX that should have been sufficient for claims made under the warranty.[156]

Going forward from the date of the Interim Financial Statements, the warranty reserve would have reflected and accommodated increasing warranty claims.

---

[153] Tr. 217–18, 249 (Hopper); JX 405 (Hopper Dep.) 193–94 ("It's possible [that the warranty reserve in the interim financial statement would not have reflected anything to do with the 21 TrX lamination issue]. There was a—there's a lag between, you know, actual and getting the claims paid. . . . If it hadn't been, you know, posted, it shouldn't be included."); 252 ("[I]f the claims were not paid, they would not have been in the financial statement.").

[154] I note that Fishing Holdings was operating on a belief that the cracks in two of the first three TrXs reported to have hull problems were likely caused by impacts. *See* Tr. 41–42 (Hopper); JX 72; JX 83; JX 314 (Houk Dep.) 70–72.

[155] JX 210 at 14.

[156] Additionally, Hopper testified that he and CFO Hughes tried to reserve more than was required and that the reserve was reviewed on a quarterly basis. JX 405 (Hopper Dep.) 216–17, 247–48, 252–53.

The Company calculated its reserve by using the total claims paid during a given year to find the percentage of the cost of goods sold attributable to the claims.[157] That percentage was used to project the costs of future claims.[158] There is no suggestion that the Company's reserve formula was unsatisfactory.[159] Indeed, Ernst & Young noted in each of its audits of the 2012, 2013 and 2014 financial statements that the methodology and calculation were appropriate.[160] The audit of the 2014 statements also reflects that, as of August 25, 2015, when the combined financial statements were available, no events had occurred that would require disclosure.[161]

---

[157] Tr. 862–63, 927 (Vanderveen) (Project Boat's accounting expert explaining the warranty reserve calculation); Tr. 207 (Wolf); JX 324 at 9–10; *see also* Tr. 166 (Wolf) (explaining that a warranty reserve has two purposes—to capture what is known and to estimate what is unknown but may occur).

[158] Tr. 927 (Vanderveen); JX 324 at 9–10.

[159] Bass Pro argues that the warranty reserve could not have accurately accounted for the TrX hull issues because the TrX was a new model and Fishing Holdings had never dealt with the particular hull issues it was encountering with that model. But, based on the language of the Triton warranty, the warranty reserve accounts for the possibility of repairing or replacing the hull of every TrX sold. The record also shows that Fishing Holdings was familiar with repairs to damaged hulls and, as discussed below, does not support that the repairs were insufficient. For these reasons as well, the range of loss that PBH Marine faced as a result of the TrX issue was not so great as to be inestimable.

[160] JX 193 at 31; JX 210 at 14.

[161] JX 210 at 16. I also note that E&Y interviewed Houk on March 19, 2015, and reported that, "[w]arranty claims have remained consistent for the past 5 years. Claim cases are relatively similar between the three main product lines. [Houk] sees a greater amount of

Of course, the evidence that the hull issue did not present a safety problem, that the case-by-case repairs were cost effective, and that the warranty reserve was audited by a third-party auditor and deemed appropriate would mean nothing if the hull repairs did not fix the problem such that hull replacement was the only option. But that is not what the evidence shows. At trial, Adkisson identified four instances where the hull repairs allegedly failed—the Beck Boat, the Coble Boat, the Govreau Boat and the Sensabaugh Boat.

With regard to the Beck Boat and Coble Boat, Adkisson testified that previously repaired cracks were evident again when the boats were returned for inspection in connection with the Replacement Program.[162] But no contemporaneous evidence corroborates that testimony, including the evidence that *should* be corroborative. Bass Pro provided dealers with a detailed inspection form to be completed in connection with the Replacement Program.[163] The inspection reports submitted as evidence, however, offer very little, and at times inconsistent,

---

claims being processed for the fiber glass boats than he does for the aluminum boats (and for a smaller dollar value), which is within EY's expectations." JX 205.

[162] Tr. 372–75, 380–81 (Adkisson).

[163] *See, e.g.*, JX 271 at 14.

43

detail.[164]  They certainly do not reveal to my satisfaction as fact-finder that the repairs on the Beck and Coble boats failed.

As for the Govreau Boat, the record suggests the first and only repair to address the cracks from the thinner lamination was a replacement of the hull.[165] If any subsequent cracks occurred, they would not be related to a failed repair.

This leaves the Sensabaugh Boat, which happened to serve as Taylor's only evidence that case-by-case repairs were insufficient.[166]  The Sensabaugh Boat was returned to Flippin twice—the first time for cracks in the hull and the second time because the deck and hull had separated.[167]  In Taylor's opinion, the separation of the hull occurred because the hull-deck joint was weakened when the boat was opened to conduct the initial repair of the laminate.[168]  During the repair of the separated hull, cracks further aft of the initial repair were reported, suggesting, in

[164] *See, e.g.*, JX 286 at BPG000240433 (inspection report for the Coble Boat referring only to the number of hours and apparently attaching a picture).  *Compare* JX 286 at BPG000240349 (inspection report for TRT14131C414 indicating that cracks were found on port side and starboard side) and JX 366 (indicating inspection report for TRT14131C414 showed cracks on both sides) with JX 286 at BPG000240475 (inspection report for TRT15101J314 with same indications as for TRT14131C414) and JX 366 (indicating a clean inspection for TRT15101J314).

[165] Tr. 134 (Hopper), 373, 375–77 (Adkisson), 456–57, 460–64 (Zittrower); JX 366.

[166] JX 322 at 20–21; JX 351 (Taylor Dep.) 79–83, 115–16.

[167] Tr. 85 (Hopper), 294–98 (Adkisson), 494–96 (Zittrower); JX 322 at 20–21.

[168] JX 322 at 20–21; JX 351 (Taylor Dep.) 79–82.

Taylor's opinion, that the initial repairs merely relocated the problem.[169]  But, in speaking with Sensabaugh, a former safety for the Dallas Cowboys and valued Triton customer,[170] Taylor learned that the owner had been operating the boat in four foot seas on Lake Champlain when it first cracked, and in four to five foot seas on Lake Eerie when the hull separated.[171]  At trial, Taylor opined that this was a normal, foreseeable use of a bass fishing boat because "[i]t's fishing," but he also admitted that these water conditions with a large operator would make a hull crack more likely.[172]  I cannot conclude, based on the repair history of the Sensabaugh Boat alone, that case-by-case repairs to the TrX hulls were inadequate such that a total product recall was required.[173]

---

[169] JX 322 at 20.

[170] Tr. 86 (Hopper), 293 (Adkisson), 793 (Taylor).

[171] JX 351 (Taylor Dep.) 83–85.

[172] Tr. 833 (Taylor) ("Q: Would you agree with me that a large former NFL football player who uses his boat five times a week and jumps off 4- to 5-foot waves is more likely to crack his hull than someone who uses his boat occasionally on a placid lake.  A: Sure.").

[173] During post-trial argument, I inquired whether possible reputational harm caused by any publicity surrounding the hull issues might be a reason to employ a product recall strategy even if the case-by-case repair approach was adequate to address the problem. Post-Trial Arg. Tr. 36–39.  As it turns out, after carefully reviewing the record and Bass Pro's trial briefs, there is no evidence to suggest there was any meaningful publicity surrounding the hull issue, much less evidence of potential reputational harm.

I also reject Bass Pro's argument that the persuasive evidence reveals that every TrX hull produced with a Ranger Layup was destined to fail.[174] I accept that a thinner laminate may crack more easily than a thicker one,[175] but Taylor provided no cogent explanation as to how or why cracking and delamination occurs in bass boats generally, or the TrX in particular.[176] Taylor performed a load analysis of the Triton and Ranger Layup samples to show that the Triton Layup breaks under less pressure than the Ranger Layup, but he provided no context or basis to assess how the "pressure" correlated to expected uses of the boat or conditions in which the boat might be operated.[177] Taylor pointed out that the marketing materials for the TrX

---

[174] Tr. 674–79, 682, 685–86, 693, 695–96, 725–29 (Taylor); JX 322 at 3–4, 19–20; JX 347 at 2–3.

[175] *See* JX 351 (Taylor Dep.) 13–16 (explaining that when bending any material, a force or pressure pulls fibers apart at the outer edge, and the thinner the material the more stress that material will suffer).

[176] At best, Taylor credits the cracking to hydrodynamic forces present beneath "planing boats," which include bass boats by design. Tr. 614–17 (Taylor). According to Taylor, planing boats are designed so that the force of the water beneath the boats allows them essentially to float above the surface. *Id.*; *see also* JX 322 at 18 ("When the Triton boats were mismatched with Ranger hulls, and built without the floatation foam in the space [between the deck and hull], the less-stiff Ranger hull was then able to deflect inwards due to the hydrodynamic forces being applied to the exterior of the hull. This deflection led to the failures that were seen on the [TrX]."). But Taylor failed to explain how these forces cause the boats to crack. *See, e.g.*, Tr. 677–78 (Taylor) (when asked by the Court to identify a "prevailing principle by either naval architecture or engineering or some other discipline" that should have informed Fishing Holdings that the Ranger Layup would not work, Taylor responded, "I think responsible engineers would have known that if you lessen the laminate by two-thirds, it's not going to be as strong").

[177] JX 322 at 14–16.

appeal to fisherman seeking a fast boat,[178] but the history of the Sensabaugh Boat, testimony from Bentz, and the Escanaba tournament confirm that the TrX may be used in a variety of water and weather conditions.[179] And Taylor provided no indication of how, if at all, the breaking points of the Triton and Ranger Layups differ in varying conditions.[180]

For his part, Bentz testified that different laminate schedules are used on different lengths of boats to prevent the boats from twisting and then cracking.[181] He stated that more laminate is required for longer boats.[182] With this in mind, I note that Taylor did not credibly explain whether, much less why, the 21-foot Triton TrX should be produced with a different laminate schedule than the 21-foot Ranger boats. Instead, he posited that the thinner Ranger Layup does not crack because Ranger

---

[178] JX 322 at 19.

[179] Tr. 831–33 (Taylor) (testifying that whether a boat cracks is a function of usage, amount of usage, and aggressiveness of usage); JX 315 (Bentz Dep.) 87–88 ("Q: Did the incidence of failure that occurred prior to the replacement program give you a sense for how quickly these failures would occur in the boats at issue? A: Depends on the conditions that the boat is in."); 97 (". . . if it was used on a lake that would have six-to-twelve-inch-high waves, there's a possibility that it would not fail. . . . Q: So failure is dependent on how it's used; would you agree with that? A: The conditions in which it is used.").

[180] When asked about his lack of analysis of the Escanaba Tournament, Taylor simply stated, "[g]uys were fishing. The boats should take it." Tr. 765 (Taylor). He then posited that if the boats were on the water, "[i]t couldn't have been that bad." *Id.*

[181] JX 315 (Bentz Dep.) 92.

[182] *Id.*

boats achieve additional strength from foam between the bottom hull and top deck that is not used in Triton boats.[183] Hopper, however, testified that the same type of foam (two pounds per cubic foot density) is used in Triton boats for flotation, and that it would not add structural integrity at that density.[184] Taylor did not perform any substantial analysis of the role of foam in the two boats or how the presence, or not, of foam affected the integrity of the hulls in question.[185]

The paucity of real analysis in Taylor's report and testimony belies his conclusion that "any reasonably competent boat designer" would know that the TrX hulls would crack and delaminate with a thinner lamination schedule.[186] Indeed,

---

[183] JX 322 at 3–4 ("[W]ithin a Ranger bass boat, there are additional structural components that provide support and rigidity for the hull (foam backing) that were not a part of the Triton boat design . . . . [The lamination substitution] error was exacerbated by not adding support/flotation foam, normally found in Ranger bass boats, but which the Triton intended hull laminate schedule did not need because it was designed strong enough to be viable without the Ranger design flotation foam providing additional backing support.").

[184] Tr. 47 (Hopper) (Q: Is the 21 TrX full of foam? A: It has foam, yes. Q: Is the foam there for structural support? A: No. The foam that's used is floatation foam . . . I'll say it's like two-pound-per-cubic-foot density. So it wouldn't lend a lot of structural integrity. It's stiffness, sound deadening, and then obviously for flotation.); JX 405 (Hopper Dep.) 162–63.

[185] As best I can discern, the extent of Taylor's analysis is as follows: JX 322 at 18 ("[T]he presence of flotation foam restricts the amount of deflection of the hull fiberglass material."); Tr. 668–69 ("[The foam] is very good in compression. It's 2 pounds per square foot, per cubic foot. . . . It's put in under pressure. It expands, fills the gaps. And what it does is it provides, for the Ranger hull, it provides continuous support of that single-laminate-layer outer hull that they have.").

[186] JX 322 at 4.

Bass Pro, and the presumably "reasonably competent boat designer[s]" it employed, did not make the decision to recall the boats until after they had investigated the issue for five months.[187]  Even then, Bass Pro's decision was made in the midst of its post-closing fuss with Project Boat when it likely was anticipating the litigation to come.[188]

Although the TrX hull failures may have been attributable to Project Boat's decision to substitute lamination schedules, the evidence does not suggest that failures required Project Boat (or Bass Pro) to recall and replace all TrX hulls.  The warranty reserve Project Boat set aside was sufficient to handle the repair or replacement of the boats, as deemed appropriate, in accordance with the warranty.[189] Accordingly, there was no liability incurred that was probable or reasonably estimable that had not already been disclosed and accounted for in the Financial Statements.

---

[187] Bass Pro did not record any warranty liability for the TrX in its December 31, 2014 financial statements.  Rather, that liability was not recorded until December 31, 2015.  Tr. 869 (Vanderveen).

[188] Tr. 557–59 (Maliszewski) (testifying that he alerted the legal department in September or October 2015, after which the primary focuses for the TrX problem were safety and the image of its newly acquired boat brands).

[189] In reaching his opinion that Project Boat was required to reserve for the Hull issue under Section 4.8, and to disclose the liability under Section 4.9, Bass Pro's accounting expert, Terry Orr, was directed to assume that the hulls had to be replaced, rather than repaired, to address the problem. Tr. 978, 992–93 (Orr).  With that assumption removed as a predicate of his opinion, Orr's testimony does not support Bass Pro's breach claim.

## B. Project Boat Did Not Breach the Agreement by Failing to Disclose the TrX Warranty Claims

In Section 4.26 ("Product and Service Warranties"), Project Boat represented that:

> [t]here is no pending or, to the knowledge of Seller, threatened (in writing) claim alleging any breach of any warranty or guaranty as to goods sold by the Company or its Subsidiaries, other than as reserved for on the Reference Balance Sheet or for claims made in the ordinary course of business consistent with past practice, individually which do not exceed $100,000.[190]

Before determining whether Project Boat breached Section 4.26, as alleged by Bass Pro, I must first construe the provision. When the parties presented competing reasonable constructions of this clause at the summary judgment stage, I determined it was ambiguous and invited the parties to submit extrinsic evidence in support of their respective positions.[191] Despite presenting a rather large trial record, the parties elected not to accept the invitation to present extrinsic evidence regarding Section 4.26, so I am left to interpret that provision on my own.[192]

Section 4.26's inceptive phrase, "[t]here is no pending or, to the knowledge of Seller, threatened (in writing) claim alleging any breach of any warranty or

---

[190] JX 192 § 4.26.

[191] Arg. on Pl.'s Mot. for Partial Summ. J. Tr. (D.I. 176) 62–63.

[192] *See*, *e.g.*, *Comerica Bank v. Glob. Payments Direct, Inc.*, 2014 WL 3779025, at *10 (Del. Ch. Aug. 1, 2014) (interpreting contract provision where plaintiff offered no legal authority or extrinsic evidence to support its construction).

guaranty as to goods sold by the Company or its Subsidiaries" appears straightforward enough. It captures pending warranty claims and known claims that have been "threatened" in writing.[193] The ambiguity lies in the balance of the provision.

From the inceptive phrase we know that Project Boat was to disclose pending or threatened (in writing) warranty claims. But then the clause appears to create an exception, ". . . other than as reserved for on the Reference Balance Sheet or for claims made in the ordinary course of business consistent with past practice, individually which do not exceed $100,000." At first glance, I interpreted "other than reserved for on the Reference Balance Sheet" to exclude from Project Boat's representation those claims that are disclosed on the Reference Balance Sheet. The Reference Balance Sheet is defined in the Agreement,[194] and the parties agree there are no TrX claims disclosed there. Again, easy enough if that clause stood on its own. But does it? The rest of the clause states, ". . . or for claims made in the ordinary course of business consistent with past practice, individually which do not exceed $100,000." The placement of the comma to separate the final phrase,

---

[193] *See* JX 193 (Schedule 4.26 cross-referencing Schedule 4.10, item #3 (*Andre P. Guidry v. Ranger Boats, LLC and Cabela's Retail LA, LLC*, civil action 3:14-CV-00567, U.S. District Court, Middle District of Louisiana, filed September 11, 2014)).

[194] Section 2.4(a) defines Reference Balance Sheet as "the most recent audited balance sheet included in the Financial Statements." JX 192 § 2.4; JX 193.

51

"individually which do not exceed $100,000," raises questions.[195] Does that phrase modify the entire provision such that Project Boat would not be obliged to disclose warranty claims that were made outside the ordinary course of business if those claims, individually, did not exceed $100,000? Or, is Project Boat obliged to disclose all warranty claims made *not* in the ordinary course of business?

After carefully reading the provision, I interpret it as follows: Project Boat was required to disclose all pending claims or claims threatened in writing that individually exceeded $100,000, unless those claims were already disclosed on the Reference Balance Sheet. Project Boat was also required to disclose all pending warranty claims and all claims threatened in writing if those claims were *not* "made in the ordinary course of business consistent with past practice" regardless of the amount of those claims. In short, I agree with Bass Pro that the $100,000 threshold does not apply if the warranty claim was made outside of the ordinary course of business, which I interpret to mean "not consistent with past practice," as stated in Section 4.26. In turn, I interpret "consistent with past practice" to mean the past practice of receiving and processing warranty claims on Triton boats.[196]

---

[195] *See Gibraltar Private Bank & Trust Co. v. Bos. Private Hldgs., Inc.*, 2011 WL 6000792, at *3 (Del. Ch. Nov. 30, 2011) (noting that the "the case would be much easier to decide" if the scrivener of a contract had been more careful in the placement of a comma); *Microstrategy, Inc. v. Acacia Res. Corp.*, 2010 WL 5550455, at *6 (Del. Ch. Dec. 30, 2010) (holding that errant placement of a comma rendered contract ambiguous).

[196] Project Boat urges a construction of "ordinary course of business" that is consistent with the court's construction of the phrase in *Ivize of Milwaukee, LLC v. Compex Litig., LLC*,

52

The evidence relating to Fishing Holding's history of receiving and processing warranty claims is difficult to distill. On the one hand, Bass Pro's witnesses observed that cracks in the laminate of a Triton boat were nearly unheard of.[197] The email correspondence following the first reports of cracks in the TrX hull lends some support to that observation. In response to the first customer complaint, Morris asked the engineering team to check if there was anything unusual about the construction of the boat.[198] Houk had a similar initial reaction when he asked Morris if the cracks in the Boat Doc Boat were in the same location on that hull as the cracks

---

2009 WL 1111179, at *9 (Del. Ch. Apr. 27, 2009). There, the court relied on Black's Law Dictionary, which "defines 'ordinary' as 'occurring in the regular course of events; normal; usual,' and defines 'course of business' as '[t]he normal routine in managing a trade of business - Also termed ordinary course of business.'" *Id*. at *8 (internal citation omitted). According to Project Boat, its "ordinary course of business" encompasses "anything related generally to [the business of building and selling boats]," including warranty claims related to the manufacture of the TrX hull. Project Boat Hldgs., LLC's Proposed Findings of Fact and Conclusions of Law ("PFF") (D.I. 211) ¶ 190 (quoting JX 309 (Maliszewski Dep.) 29). Bass Pro does not appear to take issue with Project Boat's definition of "ordinary course of business." *See* Bass Pro Gp., LLC's Resp. to Project Boat Hldgs., LLC's Proposed Findings of Fact and Conclusions of Law ("DR") (D.I. 218) 28 (citing *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Hldgs. Pvt. Ltd.*, 2014 WL 5654305, at *17 (Del. Ch. Oct. 31, 2014) (quoting *Ivize*, 2009 WL 1111179, at *9) ("This Court has previously interpreted the contractual term 'ordinary course' to mean '[t]he normal and ordinary routine of conducting business.'"). Instead, Bass Pro argues that the warranty claims at issue here relate to a product-wide defect in the hull and, therefore, cannot be within the ordinary course of Project Boat's business. In this regard, Bass Pro argues there is no evidence that Project Boat previously faced this kind of defect, specifically "a too-thin laminate throughout the entire hull," or resulting financial impact, specifically "a $5 million liability affecting over 200 boats." DR 27–28.

[197] Tr. 242–44, 278 (Adkisson), 453, 471 (Zittrower).

[198] JX 21.

53

that had been reported on the Anderson and Govreau Boats.[199] The dealer that sold the Boat Doc Boat also appeared surprised by the cracks and suggested they were out of the ordinary.[200]

On the other hand, Project Boat's witnesses suggested cracks in the laminate are relatively common, with fiberglass and gelcoat cracks by far comprising most of the warranty claims Fishing Holdings received and processed.[201] As support, Project Boat introduced its third-party warranty claims database.[202] According to Project Boat, this document demonstrates that it received 22 claims for reimbursement for third-party warranty work on cracking or delaminated Triton hulls, only two of which were for the TrX.[203] Project Boat also points to the fact that Fishing Holdings maintains a fully-staffed facility dedicated to making repairs on fiberglass hulls.[204] Finally, Project Boat presented emails from the Boat Doc Boat dealer expressing concern about cracks in a "216FH," a different boat model.[205]

---

[199] JX 82.

[200] *Id.*

[201] Tr. 29–30 (Hopper), 166–67 (Wolf); JX 314 (Houk Dep.) 86–87.

[202] JX 375.

[203] PFF ¶ 121.

[204] Tr. 33–34 (Hopper).

[205] *See* JX 195, JX 201.

After carefully considering this evidence, I am satisfied that Bass Pro has carried its burden of proving that the warranty claims related to the cracked and delaminated TrX hulls were not claims made within the ordinary course of business, albeit just barely. Project Boat did not provide any substantial analysis of its past warranty claims, through either witness testimony generally, or in a useful explication of its third-party warranty claims database. While cracks in the hull of a boat may occur on occasion, the evidence suggests that these particular cracks in the TrX were unusual. Even though the warranty claims were individually less than $100,000, they were not within the ordinary course of business and Project Boat was obliged under Section 4.26 to disclose them.

Although Bass Pro has proven that disclosure was required under Section 4.26, it has not taken the further necessary step of proving that the non-disclosure matters.[206] Bass Pro relies only on the costs of its Replacement Program to reach its $5 million damage number. Having determined that the Replacement Program was unnecessary, it follows that the disclosure of the handful of TrX warranty claims that had been made as of the Agreement would have readily been captured by the warranty reserve Project Boat had booked on its financial statements

---

[206] Post-Trial Arg. Tr. 54 (Bass Pro acknowledging that, "[t]he question . . . is whether Project Boat was obligated to disclose the whole defect *and* book a reserve for it") (emphasis supplied).

and disclosed to Bass Pro. In other words, I cannot find that Bass Pro was harmed in any way by Project Boat's failure to disclose warranty claims.[207]

## C. The TrX Hull Failures Did Not Result in a Material Adverse Effect on the Company

In Section 4.23(a) of the Agreement, Project Boat represented to Bass Pro that there had "not been any change, event, development or occurrence that individually or in the aggregate, has had or would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Company."[208] The Agreement defines Material Adverse Effect to mean "a material adverse effect on the business, results of operations, financial condition or assets of the Company and its subsidiaries, taken as a whole."[209]

While frequently alleged, breaches of a MAE clause are rarely proven.[210] "The ubiquitous . . . clause should be seen as providing a 'backstop protecting the acquirer from the occurrence of unknown events that substantially threaten the

---

[207] Given this finding, I need not address Project Boat's argument that Bass Pro has failed to present any claims that exceed the $75,000 Claims Basket in Section 11.04(b) because none of the individual warranty claims at issue would come close to reaching the $75,000 threshold. JX 192 §11.04(b). *See* PFF at ¶¶ 156–59.

[208] JX 192 § 4.23.

[209] JX 192 at 7.

[210] *See, e.g.*, *ChyronHego Corp. v. Wight*, 2018 WL 3642132, at *9 (Del. Ch. July 31, 2018) ("A contractual material adverse effect ('MAE') is like a Delaware tornado—frequently alleged but rarely shown to exist.").

overall earnings potential of the target in a durationally-significant manner.'"[211] Buyers seeking to enforce a MAE clause, thus, face a "heavy burden" to prove an "adverse change in the target's business that is consequential to the company's long-term earnings power over a commercially reasonable period, which one would expect to be measured in years rather than months."[212]

Bass Pro argues that the burden confronting a typical buyer seeking to enforce a MAE clause does not apply here because Bass Pro seeks to establish a MAE to support an indemnification claim, rather than to withdraw from the transaction. Instead of arguing that the TrX hull issues presented an adverse effect of any durational significance on the business it was acquiring, Bass Pro asks the Court to define materiality in reference to the Agreement's indemnification provisions, which, as noted, provide for a per claim basket of $75,000 and an aggregate basket amount of $350,000. Alternatively, Bass Pro points to the materiality threshold used by Project Boat's auditors—2% of net revenues or $2.6 million as of July 27, 2014, and $4 million as of November 14, 2014—as a marker for materiality under the MAE clause.[213] Since Project Boat's alleged $5 million liability exceeds both the

---

[211] *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 738 (Del. Ch. 2008) (quoting *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 68 (Del. Ch. 2001)).

[212] *Id.*

[213] JX 321 at 13.

claim baskets that support indemnification and the auditor's definition for materiality, Bass Pro argues that Project Boat's misrepresentations are "material" for purposes of establishing a MAE.

After considering the evidence and the law, I am satisfied that Bass Pro has not demonstrated that a MAE occurred as a result of the TrX hull issues. First, as explained above, the evidence does not support Bass Pro's claim that Project Boat should be accountable for the amounts Bass Pro incurred to implement its Replacement Program. Second, I decline to adopt Bass Pro's definitions of materiality. Those definitions find no support in the Agreement or in Delaware law.[214] The magnitude of the event that will trigger a finding of "materiality" must be substantial if the MAE clause is to serve its purpose as a contractual "backstop."[215] That purpose does not change just because a buyer seeks to invoke the clause to support an indemnification claim rather than to back out of the transaction. This is especially true where, as here, "MAE" is explicitly defined to require an effect on the Company as a whole, whether on its business, operations,

---

[214] Bass Pro relies on *I/M$^x$ Info. Mgmt. Sols., Inc. v. MultiPlan, Inc.*, 2013 WL 3322293, at *6 (Del. Ch. June 28, 2013), where the court used basket amounts in the indemnification provision of an agreement to construe the standard for "material breach" and "material contract" in an agreement that did not define materiality. Here, the Agreement clearly defines MAE and Bass Pro has not provided a persuasive reason why that definition should not control Project Boat's breach of the Agreement.

[215] *Hexion*, 965 A.2d at 738.

financial condition or assets. The amounts included in the Agreement's provisions limiting the indemnification rights do not speak to any of these aspects of the definition.

Setting aside its "claims basket" argument, Bass Pro has provided no context in which to consider the impact of the TrX problem on the companies it acquired, and any effort to do so would face challenges. The hull issue relates to one production year of one model among 71 models produced by Project Boat. Not surprisingly, sales of the TrX were approximately 1% of the Company's overall sales during the relevant time period.[216] And assuming, at best for Bass Pro, that this is an isolated $5 million problem, it is difficult to discern how this would affect PBH Marine in a "durationally-significant manner."[217] Nor is it clear that there has been a negative impact on the Company's earning power. Indeed, PBH Marine's gross margin and net income improved from 2014 to 2016.[218] Project Boat did not suffer a MAE.

---

[216] JX 115.

[217] *Hexion*, 965 A.2d at 738.

[218] JX 324 at 26–28.

## D. Bass Pro Has Not Proven Fraudulent Inducement

Bass Pro argues that Project Boat knowingly made misrepresentations in Sections 4.9, 4.23 and 4.26 fraudulently to induce Bass Pro to execute the Agreement.[219] Under Delaware law,

> [a] claim for fraud requires (i) a false representation, (ii) the defendant's knowledge of or belief in its falsity or the defendant's reckless indifference to its truth, (iii) the defendant's intention to induce action based on the representation, (iv) reasonable reliance by the plaintiff on the representation, and (v) causally related damages.[220]

There is some uncertainty in our law as to whether a plaintiff asserting fraud must prove the claim by clear and convincing evidence or whether a preponderance of the evidence will suffice.[221] I need not decide the question, however, because Bass Pro's proofs fail under either standard.

As an initial matter, I note that Bass Pro's fraudulent inducement claim may well be an improper "bootstrap" of its "breach of contract claim into a claim of

---

[219] Bass Pro Gp. LLC's Proposed Findings of Fact and Conclusions of Law (D.I. 210) 39–40. Bass Pro includes Section 4.8 in its analysis but, as stated, the Court dismissed Bass Pro's fraudulent inducement claim with respect to Section 4.8 on Project Boat's motion to dismiss.

[220] *Prairie Capital III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 49 (Del. Ch. 2015).

[221] *Compare Ross Hldg. & Mgmt. Co. v. Advance Realty Gp., LLC*, 2014 WL 4374201, at *37 (Del. Ch. Sept. 4, 2014) (requiring plaintiffs to prove fraud by clear and convincing evidence), with *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 Wl 4293359, at *17 (Del. Ch. Sept. 10, 2018) (requiring plaintiff to prove fraudulent inducement by a preponderance of the evidence).

fraud."[222]  I decline to decide that issue, however, because the fraud claim fails for lack of proof.

After carefully considering the evidence, I am satisfied that Bass Pro has failed to prove that Project Boat intended to induce Bass Pro to enter the contract by not disclosing the TrX warranty claims or any financial impact that might flow from those claims.  "A result is intended if the actor either acts with the desire to cause it or acts believing that there is a substantial certainty that the result will follow from his conduct."[223]  The evidence does show that Triton management told Hopper, a designated "knowledge person" under the Agreement, about the problem with the TrX hulls.  Bentz recommended a recall of the TrX and Zittrower suggested that there would be an increase in warranty claims after the Escanaba Tournament.[224]  But others within Fishing Holdings disagreed.[225]  Viewing this evidence most favorably for Bass Pro, there was uncertainty at Fishing Holdings about what they

---

[222] *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *15 (Del. Ch. Dec. 22, 2010) (internal quotation omitted) ("Delaware law holds that a plaintiff cannot 'bootstrap' a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations.").

[223] *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 811 (Del. Ch. 2014).

[224] Tr. 317–21 (Adkisson); JX 315 (Bentz Dep.) 28–30; JX 153.

[225] JX 314 (Houk Dep.) 86–87 ("My opinion to—at the time, and continues, is that the boats should have been dealt with as they come in with a problem, correct the problem, send them back out. . . .  That would include either [repair or replace].  What needed to be done to correct it.").

were dealing with and how best to address it. There is no credible evidence that Hopper believed Fishing Holdings was confronting a massive product failure but failed to disclose that fact to Bass Pro in order to lock down the Agreement. Nor has Bass Pro presented credible evidence that it would not have executed the Agreement had it known of the TrX warranty claims, i.e., reasonable reliance, particularly given the limited scope of the problem when compared to the much broader scope of the transaction. In light of Fishing Holding's history of dealing with hull damage on a case-by-case basis and Fishing Holding's belief that the hull damage could be dealt with under the existing warranty reserve, I cannot find that there was fraudulent concealment or inducement, or that Bass Pro would not have closed the transaction if Project Boat had disclosed the warranty claims.

## E. Bass Pro Did Not Breach the Agreement by Failing to Release the Escrowed Funds

Project Boat alleges Bass Pro breached Sections 11.8 and 8.2 of the Agreement as well as Section 4(g) of the Escrow Agreement by failing to release the escrowed funds and by failing to execute joint instructions when the release of the escrowed funds was required. Under Section 11.8, Bass Pro may withhold the escrowed funds if it properly asserts a claim for indemnification.[226] To assert a claim

---

[226] JX 192 § 11.8 ("[I]f any claim pursuant to Article XI shall have been properly asserted by [Bass Pro] in accordance with the Agreement on or prior to [February 10, 2016] and remain pending on [February 10, 2016] (any such claim, a "Pending Claim") . . . (ii) any funds that remain in escrow following [February 10, 2016] in respect of any such Pending

properly under the Agreement, Bass Pro was required to notify Project Boat and provide Project Boat with

> a written notice . . . (A) describing in reasonable detail the nature of the circumstances giving rise to the Indemnification Claim, (B) including [Bass Pro's] good faith estimate (based on facts then known) of the amount of Damages that may arise from such circumstances and (C) describing in reasonable detail the basis for [Bass Pro's] request for indemnification under this Agreement.[227]

Importantly, however, "[f]ailure to notify [Project Boat] in accordance with this Section 11.3(c) will not relieve [Project Boat] of any liability that it may have to [Bass Pro], except to the extent . . . the defense of such Indemnification Claim is actually materially prejudiced by [Bass Pro's] failure to give such notice . . . ."[228]

Bass Pro's Claim Notice, timely submitted to Project Boat by the one-year anniversary of the closing, identifies the issue related to the TrX hulls,[229] the provisions of the Agreement potentially impacted by Project Boat's failure to

---

Claim . . . shall be released to Seller . . . upon resolution or (if applicable) satisfaction of such Pending Claim.").

[227] JX 192 § 11.3(c).

[228] *Id.*

[229] JX 257 at 2–3 ("[F]or some period of time 2014 Triton 21 TrX boats were constructed with a Ranger hull lamination schedule rather than a Triton lamination schedule; certain such 2014 Triton 21 TrX boats have developed cracks in their hull-side panels, and in some cases have suffered delamination and/or required hull repairs due to such cracking; that the cracking and delamination issues with 2014 Triton 21 TrX boats are attributable to the use of a Ranger hull lamination schedule rather than a Triton lamination schedule in their construction . . . and that other 2014 Triton 21 TrX boats constructed with a Ranger hull lamination schedule are at risk for the same cracking and delamination issues.").

63

disclose the issue[230] and the amount of expected damages with supporting reasons for the damages.[231] The Claim Notice does not, however, reveal Bass Pro's intention to recall and replace all TrX boats produced with the Ranger Layup.

Project Boat maintains that it would have stopped Bass Pro from implementing the Replacement Program had Bass Pro disclosed that it intended to pursue that program in its Claim Notice. I reject the argument for two reasons. First, it is not clear that Bass Pro had determined to initiate the Replacement Program at the time it sent the Claim Notice. Second, and more importantly, Bass Pro apprised Project Boat of the possibility that it might seek to replace all affected TrX hulls when it disclosed that its damages were in the range of $5 million. Accordingly, I am satisfied that Project Boat received sufficient notice of Bass Pro's claims under the Agreement, and Bass Pro did not breach the Agreement by withholding the escrowed funds while it pressed its indemnification claims in court.

## F. Attorneys' Fees

The indemnification clauses in Sections 11.2 (a) and (b) of the Agreement give the buyer and seller the right to indemnification for "any and all Damages" arising from a breach of the representations and warranties or of a covenant or

---

[230] *Id*. at 3–4.

[231] *Id*. at 4–5.

agreement to be performed after the closing.[232]  The parties agree that attorneys' fees fall within the language providing for indemnification of "any and all Damages" incurred in connection with making an indemnification claim because the Agreement defines Damages to mean "all losses, damages and other costs and expenses."[233]  But Sections 11.2 (a) and (b) provide for Damages only "to the extent arising from [] any breach of any representation or warranty" in Article IV or V.[234]  Having concluded that neither party breached the Agreement, it follows that neither party is entitled to an award of attorneys' fees.

## III.   CONCLUSION

For the reasons stated above, I find for Project Boat and will enter final declaratory judgments in its favor as requested in the Complaint, with the exception of its request for attorneys' fees.  As for Bass Pro's counterclaims, I find for Project Boat.  Project Boat shall submit a conforming final judgment, upon notice as to form, within ten days.

---

[232] JX 192 § 11.2(a), (b).

[233] JX 192 at 4.

[234] *Id.*